J-A28033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA :  IN THE SUPERIOR COURT OF
                                  :          PENNSYLVANIA
                                  :

          v.                     :

ROBERT LEO BOLIN III        :

                                  :

        Appellant        :  No. 198 MDA 2025

Appeal from the PCRA Order Entered January 24, 2025
In the Court of Common Pleas of Adams County Criminal Division at
No(s):  CP-01-CR-0000108-2021

BEFORE:  KUNSELMAN, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:             **FILED: MARCH 18, 2026**

Robert Leo Bolin, III ("Bolin") appeals from the order which granted, in part, and denied, in part, his petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1]  We affirm.

The PCRA court set forth the relevant factual and procedural history of this matter, as follows:

> This case arises from [Bolin's] June 3, 2020 sexual assault against the minor victim, J.H. (hereinafter "J.H."), the biological daughter of Ms. Jodi Bunty (hereinafter "[]Bunty"), [Bolin's] former paramour.  [Bolin] and . . . Bunty had been in a relationship for approximately eight years before the incident. J.H., who referred to [Bolin] as her "dad," was approximately two years old when [Bolin] and . . . Bunty's relationship began.  At the time of the assault, J.H. was nine years old.
>
> On October 24, 2020, [Bolin] was charged with involuntary deviate sexual intercourse, unlawful contact with a minor,

---

[1] ***See*** 42 Pa.C.S.A. §§ 9541-9546.

aggravated indecent assault, indecent assault, and corruption of minors.

Jury trial commenced on August 2, 2021, before the [trial] court. [Bolin] was represented by Shawn M. Stottlemyer, Esquire (hereinafter "trial counsel"). [Bolin], . . . Bunty, [Bolin's] two biological children, and two of . . . Bunty's biological children, including J.H., resided at 211 North Berlin Avenue in New Oxford, Adams County, Pennsylvania. The residence had several bedrooms, all of which were on the second floor of the house. [Bolin] and . . . Bunty shared a bedroom, [Bolin's] biological son had his own bedroom, and J.H. shared a bedroom with . . . G., who was [Bolin's] biological daughter. The house had a downstairs living room with a television, a recliner, and a large couch.

On the night of June 3, 2020, [Bolin] sexually assaulted J.H. while she was lying on the couch in the living room. That night, J.H. had trouble sleeping in her bedroom on the second floor, so she went downstairs to lay down on the couch, where [Bolin] was sitting, and G. was sleeping on the right side of the couch. J.H. laid on the left side of the couch, and [Bolin] was watching television while sitting between the two children. J.H. rested her head on the arm of the couch and attempted to fall asleep. Thereafter, the assault occurred.

As she lay on the couch, J.H. felt [Bolin] move aside her shorts and underwear. J.H. then felt [Bolin] penetrate her external genitals with his finger and then his tongue. J.H. immediately recognized the inappropriateness of [Bolin's] conduct. [Bolin] stopped when he saw J.H. opening her eyes; however, J.H. still observed [Bolin] touching her. J.H. then returned to her bedroom. [Bolin] entered J.H.'s bedroom with a glass of water and said goodnight to her before leaving. J.H. cried before falling asleep.

The next day, June 4, 2020, J.H. tearfully disclosed the abuse to . . . Bunty. . . . Bunty left the residence with all the children and contacted Children & Youth Services [("CYS")]. Before leaving the residence, . . . Bunty collected the underwear that J.H. was wearing at the time of the assault and placed the underwear in a plastic bag and put it in her dresser drawer at the residence. . . . Bunty subsequently provided the underwear to Eastern Adams Regional Police. Approximately 20 hours after the

assault, J.H. underwent a sexual assault examination at WellSpan Gettysburg Hospital, and her external genitals were swabbed. The Eastern Adams Regional Police submitted both the collected underwear and the external genital swabs to the Pennsylvania State Police Harrisburg Regional Laboratory.

Subsequent analysis indicated [Bolin's] responsibility for the sexual assault. A serological analysis by forensic scientist Deborah Zamboni (hereinafter "[]Zamboni") detected the presence of body fluids on the underwear; . . . Zamboni cut out two pieces of the underwear for further analysis. . . . Allison Miller (hereinafter "DNA expert"), a forensic DNA scientist who works in the Pennsylvania State Police Forensic Unit Division, analyzed both the underwear cuttings and an external genital swab. The DNA expert's analysis of these items indicated [Bolin] as a likely contributor of the Y chromosome DNA found thereupon.

[Specifically, the DNA expert's analysis revealed a complete match between the non-sperm fraction of the Y chromosome DNA profile from the front of the underwear's crotch panel and the Y chromosome DNA profile of a known reference sample taken from Bolin. There was a match between all 25 loci of the Y chromosome DNA profiles from: (1) this underwear cutting; and (2) Bolin's reference sample. Bolin and his paternally related male relatives could not be excluded as contributors of the Y chromosome DNA profile from the front crotch panel cutting, which could be expected to be found in only one of every 9,742 males.

The DNA expert's analysis also revealed a partial match between the non-sperm fraction of the Y chromosome DNA profile from the back of the underwear's crotch panel and the Y chromosome DNA profile of Bolin's reference sample. There was a match between 19 loci of the Y chromosome DNA profiles from: (1) this underwear cutting; and (2) Bolin's reference sample. Again, Bolin and his paternally related male relatives could not be excluded as contributors of the Y chromosome DNA profile on the back of the crotch panel.

Finally, the DNA expert's analysis revealed a partial match between the non-sperm fraction of the Y chromosome DNA profile from an external genital swab and the Y chromosome DNA profile of Bolin's reference sample. There was a match between 24 loci

of the Y chromosome DNA profiles from: (1) the swab; and (2) Bolin's reference sample. Bolin and his paternally related male relatives could not be excluded as contributors of the Y chromosome DNA profile on the swab, which could be expected to be found in only one of every 9,742 males.

At trial, the parties stipulated that Bolin's biological son, who lived at the residence, did not have direct contact with J.H.'s genitals and did not come into contact with J.H.'s underwear while in J.H.'s presence. This stipulation tended to establish that Bolin contributed the Y chromosome DNA found on the aforementioned items.]

At trial, [Bolin] testified that he lay down on the couch to fall asleep and, in doing so, placed the top of his head between J.H.'s legs, which he claimed were already spread, so that his head rested on J.H.'s inner thigh. [Bolin] also admitted that he shifted J.H. on the couch by pushing her "crotch area" and that he kissed the inner area of J.H.'s upper thigh as "sign of affection" that "was nothing sexual." [Bolin] also elicited testimony from the DNA expert on cross-examination that it was hypothetically possible for DNA to transfer among dirty clothes in a laundry basket and for an individual folding laundry to leave his or her DNA on the items, based on cross-contamination.

At the conclusion of trial, the jury found [Bolin] guilty of all charges. On October 26, 2021, the [trial] court sentenced [Bolin] to an aggregate term of 15 to 30 years' imprisonment in a state correctional institution with a consecutive term of three years' probation for the unlawful contact conviction.

* * * *

On December 2, 2022, the Superior Court . . . affirmed [Bolin's] judgment of] sentence. [Bolin did not seek further review in the Supreme Court of Pennsylvania.]

On December 19, 2023, [Bolin] timely filed his PCRA petition through J. Andrew Salemme, Esquire (hereinafter "PCRA counsel"). [Therein, Bolin raised a single claim relating to the ineffectiveness of direct appeal counsel, and several claims relating to the ineffectiveness of trial counsel.]

* * * *

On May 1, 2024, the [PCRA] court entered an order denying [Bolin's] request for discovery to obtain, review[,] and independently test the debris removed from the underwear of J.H. to support [one of his] claim[s] of ineffective assistance of trial counsel.

On September 5, 2024, [Bolin's] PCRA evidentiary hearing was held before the [PCRA] court. Testimony was presented and the evidentiary record was closed. With the agreement of [Bolin] and the Commonwealth, [Bolin's] PCRA counsel requested a transcript of the PCRA evidentiary hearing. Upon receipt of the transcript, [Bolin's] counsel was granted thirty days to file a brief in support of the PCRA petition. The Commonwealth was granted thirty days to file a response brief upon receipt of [Bolin's] brief.

PCRA Court Opinion, 1/24/25, at 1-7 (some footnotes and unnecessary capitalization omitted, footnote 8 incorporated into the quoted text in brackets).[2]

Upon the completion of additional briefing, the PCRA court entered an order and opinion on January 24, 2025, granting Bolin relief on his first claim, pertaining to the ineffectiveness of appellate counsel, but denying relief on

_____

[2] Under the PCRA, a petition must be filed within one year of the date on which the judgment of sentence becomes final. *See* 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of Pennsylvania and the United States Supreme Court, or at the expiration of time for seeking such review. *See* 42 Pa.C.S.A. § 9545(b)(3). As indicated above, Bolin did not seek review in the Supreme Court of Pennsylvania. As such, his judgment of sentence became final on January 2, 2023, which was thirty days after this Court affirmed his judgment of sentence. *See* 42 Pa.C.S.A. § 9545(b)(3); *see also* Pa.R.A.P. 1113(a) (providing a petition for allowance of appeal shall be filed within thirty days after the entry of the order of the Superior Court). As a result, Bolin had one year from that date, until January 2, 2024, to timely file a PCRA petition. *See* 42 Pa.C.S.A. § 9545(b)(1). As the instant petition was filed on December 19, 2023, it is timely.

his remaining claims relating to the ineffectiveness of trial counsel. Bolin filed

a timely notice of appeal, and both he and the PCRA court complied with

Pa.R.A.P. 1925.[3]

Bolin raises the following issues for our review:

1. Whether the PCRA court erred in finding trial counsel was effective in stipulating to the chain of custody of J.H.'s underwear where counsel's strategy was to call into question whether the underwear obtained by police had been the underwear J.H. was wearing at the time of the alleged incident?

2. Whether the PCRA court erred in finding trial counsel was effective in failing to adequately cross-examine the DNA expert witnesses regarding cross-contamination?

3. Whether the PCRA court erred in finding trial counsel was effective in not obtaining, reviewing, or DNA testing the debris found in J.H.'s underwear?

4. Whether the PCRA court erred in finding trial counsel was effective in not objecting to, or seeking to exclude admission of, Trial Exhibit 6 and the reading thereof by . . . Nurse Small based on a confrontation clause violation?

5. Whether the PCRA court erred in finding trial counsel effective in not presenting the character testimony of Holly Owens?

6. Whether trial counsel's cumulative errors were so significant that they deprived Bolin of a fair trial in violation of his due process rights and his state and federal constitutional right to a fair trial?

Bolin's Brief at 7 (issues reordered for ease of disposition).

_____

[3] In lieu of authoring an opinion pursuant to Rule 1925(a), the PCRA court directed this Court to the opinion it entered in conjunction with its January 24, 2025 order granting, in part, and denying, in part, Bolin's petition. **See** Pa.R.A.P. 1925(a)(1).

Our standard of review of an order denying PCRA relief is well-settled:

We review an order [deny]ing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

Where, as here, an appellant asserts that counsel was ineffective, the following standards apply:

To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 [(1984)]. Accordingly, to prove that counsel was ineffective, the petitioner must demonstrate: (1) that the underlying claim has arguable merit; (2) that no reasonable basis existed for counsel's actions or failure to act; and (3) that the petitioner suffered prejudice as a result of counsel's error. To prove that counsel's chosen strategy lacked a reasonable basis, a petitioner must prove that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. Regarding the prejudice prong, a petitioner must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. Counsel is presumed to be effective; accordingly, to succeed on a claim of ineffectiveness[,] the petitioner must advance sufficient evidence to overcome this presumption.

We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong

- 7 -

that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. Finally, counsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Johnson*, 139 A.3d 1257, 1272 (Pa. 2016) (some citations and quotation marks omitted).

In his first issue, Bolin challenges the PCRA court's determination that counsel was not ineffective for stipulating to the chain of custody for J.H.'s underwear. At trial, the Commonwealth and trial counsel placed the following stipulation on the record:

> The Commonwealth and the defense agree that chain of custody under the Stipulated Order means that it is agreed that the physical evidence listed below as presented in court is the same evidence collected during the investigation; and, two, said physical evidence was properly maintained and controlled from seizure throughout any and all custody transfer and analysis up to and including presentation in court.
>
> The items of evidence to which chain of custody is being stipulated are: The one pair of white underwear belonging to J.H., one envelope containing external genitalia collection samples, one bag containing black shorts, one buccal swab from J.H., and one buccal swab from Robert Bolin, III.

N.T. (Trial), 8/3/21, at 260.

In his counseled PCRA petition, Bolin claimed that trial counsel was ineffective for entering the stipulation. Bolin framed his ineffectiveness claim as follows: "ineffective assistance of counsel: stipulation to chain-of-custody of underwear." PCRA Petition, 12/19/23, at 13 (unnecessary capitalization omitted). Bolin asserted that a factual dispute surfaced at trial as to when law enforcement obtained J.H.'s underwear and whether it was the same pair

of underwear that J.H. was wearing when the alleged sexual assault occurred. *See id*. Bolin pointed to the discrepancy between Bunty's testimony that she placed J.H.'s underwear in a plastic bag in her dresser drawer and provided the underwear to the police on June 5, 2020, whereas law enforcement recorded receiving a pair of J.H.'s underwear on June 4, 2020. *See id*. Bolin averred that, "[d]espite those discrepancies, and highlighting them during his cross-examination and closing statement, [trial counsel] inexplicably stipulated to chain of custody of the underwear, representing that they were the same ones 'collected during the investigation' and likely insinuating to the jury that there was no real dispute." *Id*. at 14. The crux of Bolin's ineffectiveness claim, as set forth in his petition, was that "[trial counsel] lacked an objective reasonable basis for stipulating to chain of custody where a critical component of his trial strategy was to highlight the discrepancy as to when and/or what underwear was provided." *Id*.

In his appellate brief, Bolin significantly diverts from his initial claim of ineffectiveness, as detailed in his petition. Bolin points to trial counsel's testimony at the evidentiary hearing that "the whole defense strategy" was "trying to argue to the jury that the underwear had been tampered with by . . . Bunty." Bolin's Brief at 47. Bolin acknowledges that trial counsel questioned both Bunty and Officer Darryl Keller ("Officer Keller") regarding the discrepancies concerning when the underwear was provided to police, and that trial counsel highlighted those discrepancies during his closing

statement, wherein he argued that such discrepancy alone created reasonable doubt. *See id*. However, on appeal, Bolin does not specifically argue that counsel was ineffective for entering the stipulation. Indeed, Bolin acknowledges that the stipulation was limited to an agreement that the evidence seized by police was the evidence that was tested and produced at trial.

Instead, Bolin claims that trial counsel was ineffective for entering the stipulation "***without clarifying*** [to the jury] that he was disputing that the underwear provided was the actual underwear worn during the incident." Bolin's Brief at 47 (emphasis in original). Bolin argues that trial counsel was ineffective because he "never told the jury that his stipulation to the chain of custody did not mean that he was agreeing that the underwear provided by Bunty was the actual underwear worn by J.H." *Id*. at 48. According to Bolin, "the jury was left with the false impression that Bolin was not contesting that the underwear provided was different from the underwear that J.H. was wearing on June 3. 2020." *Id*. at 48-49. Bolin maintains that trial counsel's failure to "explain[] to the jury that Bolin's position was that the underwear provided to police had been tainted by Bunty and was not the underwear that J.H. actually wore on the night of the alleged incident, could have reasonably had an adverse effect on the outcome at trial." *Id*. at 49.

The PCRA court considered Bolin's first issue and determined that it lacked merit. The court reasoned:

In [his first issue, Bolin] argues trial counsel was ineffective for stipulating to the chain of custody of J.H.'s underwear at trial. This claim has no merit and is not supported by the facts presented at trial.

\* \* \* \*

As trial counsel testified at the PCRA evidentiary hearing, and as set forth in the above stipulation, the stipulation for chain of custody only included chain of custody **after the above evidence was collected by the Eastern Adams Regional Police Department**. During the PCRA evidentiary hearing, trial counsel testified that he did not stipulate to chain of custody of the underwear from its seizure by . . . Bunty, but only stipulated to chain of custody **after the above items, including the underwear, were in police custody**. This allowed trial counsel to question . . . Bunty and the police about the discrepancy when the underwear was collected by the police. It also allowed trial counsel to argue to the jury that the discrepancy as to when the underwear was obtained by . . . Bunty and given to the police created a reasonable doubt. Furthermore, . . . **there were no chain of custody issues which would have impacted the admissibility of the underwear and/or testing upon the underwear**. [Bolin's] issue has no merit. Trial counsel had a reasonable basis to enter into the stipulation. [Bolin] was not prejudiced by trial counsel's act or omission.

PRA Court Opinion, 1/24/25, at 10-11 (emphasis added, unnecessary capitalization omitted).

Based on our review, we initially question whether we may address the various ineffectiveness claims related to the stipulation that Bolin presents for our review. In the PCRA context, it is well-settled that a petitioner may not assert additional trial counsel ineffectiveness claims beyond those set forth in his PCRA petition. **See Commonwealth v. Ousley**, 21 A.3d 1238, 1242 (Pa. Super. 2011) (holding that issues not raised in a PCRA petition cannot be considered on appeal). Instead, a petitioner must seek leave from

the PCRA court to file an amended PCRA petition. **Commonwealth v. Rykard**, 55 A.3d 1177, 1192 (Pa. Super. 2012) (holding that "in order to properly aver a new non-PCRA counsel ineffectiveness claim, the petitioner must seek leave to amend his petition"); **see also Commonwealth v. Porter**, 35 A.3d 4, 12 (Pa. 2012) (holding that "amendment is permitted only by direction or leave of the PCRA court").

As explained above, Bolin's specific claim in his PCRA petition was that trial counsel was ineffective for **entering the stipulation**. **See** PCRA Petition, 12/19/23, at 13-14. However, on appeal, Bolin presents additional ineffectiveness claims related to the stipulation, averring that trial counsel was also ineffective for: (1) **not explaining to the jury** that his stipulation to the chain of custody did not mean that he was agreeing that the underwear provided by Bunty was the actual underwear worn by J.H.; and (2) **not arguing to the jury** that the underwear provided to police had been tainted by Bunty. As Bolin did not raise these additional claims of trial counsel ineffectiveness in his PCRA petition or seek leave from the PCRA court to amend his petition to add these additional ineffectiveness claims, the PCRA court was not required to address them, and did not address them. **See Ousley**, 21 A.3d at 1242; **see also Rykard**, 55 A.3d at 1192.[4]

_____

[4] We further note that these additional claims of trial counsel ineffectiveness were not raised in Bolin's concise statement of errors complained of on appeal. **See** Concise Statement, 2/18/25, at 1-2. Where, as herein, the
*(Footnote Continued Next Page)*

- 12 -

With respect to Bolin's preserved claim that trial counsel was ineffective for entering the stipulation, we conclude that the PCRA court's determination that counsel was not ineffective is supported by the record and free of error. As the plain language of the stipulation makes clear, the stipulation only concerned and applied to the time period **after** the subject underwear had been provided to police. In other words, trial counsel only stipulated that the particular pair of underwear that Bunty provided to police was the same pair of underwear that the Commonwealth produced at trial, such that **the chain of custody of the underwear - while in police custody – remained intact**. As noted by the PCRA court, there were no concerns raised as to the maintenance of the underwear while in police custody.

Furthermore, the stipulation, by its very terms, did not apply to the period of time **before** Bunty gave the pair of underwear to police. To be sure, the stipulation did not concede that the pair of underwear that Bunty gave to police was the underwear that J.H. was wearing at the time of the

_____

lower court directs a defendant to file a concise statement of matters complained of on appeal, any issues not raised in that statement are waived. **See Commonwealth v. Lord**, 719 A.2d 306, 308 (Pa. 1998); **see also** Pa.R.A.P. 1925(b)(4)(vii) (providing that issues not included in the concise statement are waived); **Commonwealth v. Lemon**, 804 A.2d 34, 36-37 (Pa. Super. 2002) (holding that waiver results from a Rule 1925(b) statement's omission of the specific theory raised on appeal). Nor were these additional claims of trial counsel's ineffectiveness raised in Bolin's statement of questions involved. **See** Bolin's Brief at 7. Pursuant to Pa.R.A.P. 2116(a), "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." Thus, we also deem these additional claims of trial counsel ineffectiveness waived.

sexual assault. Thus, by entering the stipulation, trial counsel did not agree that the pair of underwear that Bunty provided to police was, in fact, the same pair of underwear that J.H. was wearing at the time of the sexual assault. Moreover, Bolin concedes that trial counsel highlighted the discrepancies as to when police received a pair of underwear from Bunty both during his cross-examination of Bunty and Officer Keller, and during counsel's closing argument to the jury.

While trial counsel did not specifically explain to the jury that the stipulation only covered the period **after** police had received the pair of underwear, the plain terms of the stipulation—which indicated that it only applied to the period **after** police had received the underwear—were read to the jury in open court. Thus, we presume that the jury was capable of grasping what period of time was covered by the stipulation, and what period of time was not. **See Lewis v. Reading Hosp.**, 345 A.3d 257, 272 n.6 (Pa. Super. 2025) (holding that "[w]e presume as a matter of law that juries will understand complex fact patterns"). Additionally, counsel's cross-examination and closing arguments regarding the discrepancies in the handling of J.H.'s underwear, and when a pair of underwear was provided to police, implicitly reinforced to the jury that the stipulation did not apply to the period **before** the underwear was provided to police. **See id**. Accordingly, as the record supports the PCRA court's determination that

- 14 -

Bolin's first ineffectiveness claim lacked arguable merit, we conclude that no relief is due.

In his second issue, Bolin challenges the PCRA court's determination that trial counsel was not ineffective in his cross-examination of the DNA expert regarding cross-contamination. The following exchange took place during trial counsel's cross-examination of the DNA expert regarding the possibility of cross-contamination of an individual's DNA within a household:

> [Trial Counsel]: How durable is DNA? For example, when people live in a household together, is DNA easily transferable?
>
> [DNA expert]: If somebody comes into contact with another object that somebody else did touch, there's a lot of factors that go into it like how long somebody were to hold a particular item that somebody else in the household had touched, it can transfer, yes.
>
> [Trial Counsel]: What if clothes, hypothetically, were thrown in dirty laundry together, would DNA be possible to transfer?
>
> * * * *
>
> [DNA expert]: I'm sorry. Can you repeat the question?
>
> [Trial Counsel]: Sure. If a family has a laundry basket everybody throws their dirty clothes in at the end of the day, can—hypothetically, can DNA transfer from one item of clothes to another?
>
> [DNA expert]: Hypothetically, if, you know, again, there's a lot of factors; if there's—some people are good skin shed, so they'll shed more DNA versus others onto their clothing. And that depends on whether, you know, what type of DNA is on there, whether its saliva or sweat, and how those clothing comes together, whether it's some type of friction. Typically, you would need some kind of force, or friction between those items in order for it to transfer.

[Trial Counsel]: Okay.  And you kind of took the word — So, sweat can also contain DNA?

[DNA expert]: Yes.

[Trial Counsel]: And this Y chromosome test, can you tell the difference between sweat and saliva?

[DNA expert]: My testing I cannot tell you where the DNA came from, no.

[Trial Counsel]: What about folding laundry, can you transfer — can I, if I'm folding my kids laundry, can DNA from my hands transfer on to their clothes?

DNA expert: That's a possibility.

N.T (Trial), 8/3/21, at 215-16.

The following exchange also occurred between trial counsel and the

DNA expert on recross-examination regarding the results of her testing:

[Trial Counsel]: Sure.  Let me ask you this.  You say . . . Bolin nor any of his paternally related male relatives can be excluded.  That would include his son, I assume?

[DNA Expert]: Correct.

[Trial Counsel]: Cousins?  Uncles?  Dad, all as long as they're on his dad's side?

[DNA Expert]: As long as they are paternally related, yes.

[Trial Counsel]: And that same confidence that you just expressed would apply to all — every male — paternally related male relative of Mr. Bolin?

[DNA Expert]: Correct.

N.T. (Trial), 8/3/21, at 218-19.

Bolin contends that trial counsel failed to adequately question the DNA expert regarding the possibility of cross-contamination where J.H.'s underwear was placed in Bunty's dresser drawer and J.H. had taken the underwear off at Bolin's residence where his DNA, and his son's DNA, would be present.[5] Bolin claims that his DNA, as well as that of his son, and even his paternal grandfather would necessarily be littered throughout his household, on clothing that he handled while doing laundry, and in myriad places throughout the residence, including the couch on which J.H. had been asleep at the time of the incident. Bolin argues that trial counsel did not question the DNA expert concerning the prevalence of Bolin and his son's DNA being present in the home nor about the likelihood of Bolin's DNA being present in Bunty's dresser drawer, on the couch, or on the floor. Bolin asserts that trial counsel could have no reasonable basis for failing to highlight the extent to which Bolin and his son's DNA would be located in Bolin's home.

Bolin acknowledges that trial counsel indicated at the PCRA evidentiary hearing that he wanted the jury to know that Bolin and his son's DNA would be all over the house, which was why he asked the DNA expert questions about sharing laundry baskets and Bolin's son living in the house. **See** Bolin's

---

[5] In his brief, Bolin at times refers to the "DNA experts," and seemingly argues that trial counsel was ineffective in questioning multiple DNA experts. **See** Bolin's Brief at 32. However, as the PCRA court made clear, Allison Miller was the **only** DNA expert who testified at trial. **See** PCRA Court Opinion, 1/24/25, at 16.

Brief at 33. Bolin further acknowledges that trial counsel argued in his closing summation that "there's a lot of ways that a DNA match of . . . Bolin could end up on clothes in possession of . . . Bunty," noting that "Bolin did a lot of laundry." *Id*. Bolin references trial counsel's explanation that the only reason he did not further question the DNA expert on Bolin's, his son's, and potentially his paternal grandfather's DNA being all over the residence was that the DNA expert testified that cross-contamination was possible from doing laundry. *See id*. at 34.

Nevertheless, Bolin asserts that if trial counsel had asked questions about the prevalence of DNA in the home, it would not have undermined the cross-contamination point nor offered an opportunity for the DNA expert to explain how cross-contamination could not have occurred. Bolin claims that he suffered prejudice because the only evidence against him besides J.H.'s testimony was the DNA evidence, and the jury was unaware that Bolin's DNA, and his son's and paternal grandfather's DNA, would be expected to be present throughout his residence and could have resulted in cross-contamination in addition to Bolin handling the laundry.

The PCRA court considered Bolin's second issue and determined that it lacked merit. The court reasoned:

> [Bolin] argues trial counsel was ineffective for failure to adequately cross-examine the DNA expert witness regarding cross-contamination where J.H.'s underwear was placed in her mother's dresser drawer, and J.H, had taken the underwear off at Bolin's residence where his DNA (and his son's DNA) would be

everywhere. This claim has no merit and is not supported by the facts presented at trial.

The only DNA expert who testified at trial was forensic DNA scientist Allison Miller. During trial counsel's cross-examination of the DNA expert, she testified that three separate DNA samples submitted for testing indicated [Bolin] as a likely contributor of the Y chromosome DNA found thereupon. (***See*** footnote 8 on page 4 of this opinion). The DNA expert testified that she was unable to tell whether the DNA tested and observed came from saliva, blood, skin cells or the root of a hair. . . .

* * * *

At the PCRA hearing[,] trial counsel testified that his strategy concerning cross-examination of the DNA expert was to get the expert to admit it was possible someone other than [Bolin] could have been a contributor of the DNA, including [Bolin's] son, and any other paternally related male relative including cousins, uncles, and Dad. Trial counsel testified that he asked a hypothetical question of the DNA expert concerning cross-contamination with the laundry and received the appropriate answer[,] but did not ask further questions for fear the DNA expert would further explain her conclusions to the detriment of [Bolin]. During closing argument trial counsel raised the issue of cross-contamination, and further argued that multiple male relatives of [Bolin] could have been the source of the DNA.

[Bolin] also argues that J.H.'s underwear was placed in a drawer by Ms. Bunty which contained Ms. Bunty's clothes and could have contained [Bolin's] DNA. This argument fails because Ms. Bunty testified that she placed J.H.'s underwear into a plastic bag and sealed the bag before she put it in her drawer. Furthermore, this argument does not consider the DNA which was obtained from the external genitalia swab of J.H.

[Bolin's second issue] fails for lack of arguable merit. Furthermore, trial counsel had a reasonable strategy concerning his cross-examination of the DNA expert, the DNA expert provided testimony favorable to [Bolin], and trial counsel highlighted this testimony during closing argument to cast doubt upon the DNA evidence. Trial counsel was effective in his

questioning of the DNA expert.  . . .  [Bolin] was not prejudiced by trial counsel's act or omission.

PCRA Court Opinion, 1/24/25, at 16-19.

Based on our review, we conclude that the PCRA court's determination that Bolin's second ineffectiveness claim lacked merit is supported by the record and free of error.  Contrary to Bolin's claim otherwise, the jury was not "unaware" that other paternal relatives of Bolin were present in the home and could have been a source of the DNA.  As reflected above, trial counsel elicited testimony from the DNA expert that, in some instances, DNA could be transferred by touching an item that somebody else in the household had touched.  *See* N.T (Trial), 8/3/21, at 215.  The record reflects that trial counsel utilized this expert testimony to argue to the jury in his closing summation that another paternally-related male relative of Bolin could have been the source of the DNA:

> Now, you also heard quite a bit of testimony from a DNA expert.  They did two types of testing on th[e] underwear.  One contest [*sic*] anybody's DNA, male, female, and give you a pretty good idea of the genetic ID, so to speak.  The other was a Y chromosome test[,] tested for males[,] and only can test the male lineage.
>
> [The DNA expert] testified that this DNA does not exclude . . . Bolin but it doesn't exclude any of his paternally-related male relatives, either.  This is a confidence level that gave a one out of a merely 10,000 people.  And that's a big number, one out of 10,000 could possibly match his genetic code.
>
> **Remember, two of them are living in the same household**.  Remember, also, that they can't differentiate between saliva DNA, skin cell DNA, sweat DNA.  That's what the expert told us, and that **DNA can be transferable**.  Whether it's

easy or not easy, it doesn't matter. ***It is transferable from other ways***.

And, so, ***there's a lot of ways that a DNA match of . . . Bolin could end up on clothes in possession of . . . Bunty***. Remember, [Bunty] left the day with all the kids, including . . . Bolin's son. She testified that . . . ***Bolin did a lot of the laundry***. She testified — You know, you heard testimony that ***they were sitting next to each other on the couch, laying on top of him, she was laying across him, he was laying down next to her***.
So, the DNA, you know, doesn't necessarily say this is definitely . . . Bolin. ***It just says . . .Bolin or any of his paternally-related male relatives cannot be ruled out. And there's him and one other person in the house DNA can be transferred***.

N.T. (Trial), 8/4/21, at 302-03 (emphasis added).

Here, trial counsel's closing remarks pointedly argue that, given the ability of DNA to be transferred within the home via saliva, skin cells, and/or sweat, the DNA of another paternally-related male relative could have been the source of the DNA found on J.H.'s underwear.[6] Accordingly, as the record support's the PCRA court's determination that trial counsel had a reasonable basis to pursue his strategy concerning his cross-examination of the DNA expert, we conclude that Bolin's second ineffectiveness claim merits no relief.

In his third issue, Bolin challenges the PCRA court's determination that trial counsel was not ineffective for failing to obtain, review, or DNA test the

---

[6] The PCRA court noted that the parties stipulated that Bolin's biological son, who lived at the residence, did not have direct contact with J.H.'s genitals and did not come into contact with J.H.'s underwear while in J.H.'s presence. ***See*** PCRA Court Opinion, 1/24/25, at 4 n.8. However, Bolin does not challenge the entry of that stipulation by trial counsel.

- 21 -

debris found in J.H.'s underwear. Notably, during trial, forensic scientist Zamboni testified that, in her expert report she stated, "that debris was removed from [the underwear] and was packaged for return inside Item 1." N.T. (Trial), 8/3/21, at 147. Zamboni did not explain what the "debris" consisted of, or where it was located on the underwear. However, Zamboni generally explained that, "I believe that I mentioned previously that when I look at an item[,] sometimes I will remove debris or hair-like debris and then we package that in a separate envelope for return to the submitting agency." *Id*.

Bolin argues that, although trial counsel was aware of the existence of the debris prior to trial, he did not confirm the contents of the debris, or test the DNA therefrom. Bolin points to his own testimony that, on the night of the alleged incident, Bunty started to cut his hair, and the girls joined in. Bolin claims that, following the haircut, he had no hair on his head. Bolin queries that, if the debris in J.H.'s underwear consisted of hair which matched Bolin's DNA profile, the haircut would have provided a reasonable and innocent explanation for why his DNA profile was on J.H.'s underwear.

Bolin points to trial counsel's testimony at the evidentiary hearing that he never learned the content of the debris, and that perhaps he should have

asked what debris means at trial. Bolin asserts that trial counsel had no reasonable basis for not asking what the debris was at trial.[7]

The PCRA court considered Bolin's third issue and determined that it lacked merit. The court reasoned:

> In [his third issue, Bolin] argues trial counsel was ineffective for not obtaining, reviewing, or testing the debris found in J.H.'s underwear. This claim has no merit and is not supported by the facts presented at trial.
>
> The evidence presented at trial precludes [Bolin's] contention that the non-sperm fraction of the DNA from the front and back of J.H.'s underwear and the non-sperm fraction of the DNA from J.H.'s external genitalia swab was comprised from DNA from [Bolin's] hair. . . . Zamboni testified that the DNA extracted from the front panel and back panel of J.H.'s underwear was obtained from stains on the underwear which were discovered and observed utilizing an alternate light source and showed areas of fluorescence on J.H.'s underwear, indicating the presence of bodily fluids. Furthermore, while the DNA expert testified that she could not identify the specific type of cell responsible for the three separate DNA profiles matching [Bolin], including the external genitalia swab of J.H., it is pure speculation on [Bolin's] part that the external genitalia swab may have come from [Bolin's] hair. At trial, the DNA expert testified that the root of the hair can leave DNA behind on other objects . . . but never testified that stains on J.H.'s underwear or the DNA resulting from the external genitalia swab of J.H. could have come from [Bolin's] hair.
>
> . . . Zamboni's testimony precludes [Bolin's] argument that the DNA on the stains on J.H.'s underwear could have come from [Bolin's] hair. . . . Zamboni testified that she removed any obvious debris or hair[-]like debris from the underwear and

_____

[7] We note that Bolin devotes much of his argument for his third issue to a claim that the PCRA court erred in denying his request to have the debris tested during these PCRA proceedings. However, as Bolin did not raise that claim of error in either his concise statement or in his statement of questions involved, we may not address it. *See* Pa.R.A.P. 1925(b)(4)(vii); *see also* Pa.R.A.P. 2116(a).

package before she examined the underwear. Through her examination of the underwear, it is clear the DNA came from some type of bodily fluid. Furthermore, it is pure speculation that the DNA from the external genitalia swab came from [Bolin's] hair, given the testimony of Nurse Small concerning how the external genital swab was performed.

Therefore, trial counsel would have had no reasonable basis to test the debris collected by . . . Zamboni prior to her analysis of J.H.'s underwear. Even if testing [had] occurred on the debris collected from J.H.'s underwear, which [hypothetically] showed the debris contained DNA that matched the DNA sample of [Bolin], such finding would not [have been] helpful to [Bolin's] defense as the DNA expert testified, based on her analysis, she could not testify as to the specific type of non-sperm cell the DNA came from.

Finally, [Bolin] testified at trial that he took a shower after the alleged haircut, which would preclude the likelihood that the debris in J.H.'s underwear contained [Bolin's] DNA from his hair.

[Bolin's third issue] has no merit. Trial counsel will not be deemed ineffective for failing to raise a meritless claim. . . . [Bolin] was not prejudiced by trial counsel's act or omission.

PCRA Court Opinion, 1/24/25, at 20-22 (quotation marks omitted).

Based on our review, we conclude that the PCRA court's determination that counsel was not ineffective for failing to obtain, review, or DNA test the debris found in J.H.'s underwear is supported by the record and free of error. Bolin's ineffectiveness claims rests entirely on his speculation that the "debris" may have consisted of his hair. Notably, Zamboni generally testified that when testing an item, she "sometimes . . . will remove debris or hair-like debris." N.T. (Trial), 8/3/21, at 147. Although Zamboni distinguished between "debris" and "hair-like debris," she did not indicate that when testing

J.H.'s underwear she removed "hair-like debris." *Id*. Rather, she merely indicated that she removed "debris." *Id*.

Moreover, the DNA extracted from the front panel and back panel of J.H.'s underwear was obtained from *stains* on the underwear which were discovered and observed utilizing an alternate light source and showed areas of fluorescence on J.H.'s underwear, indicating the presence of *bodily fluids*. However, there was no testimony by any expert in this case that the presence of hair could leave stains from bodily fluids. Thus, even assuming that a piece of Bolin's hair could have gotten into J.H.'s underwear and was thereafter removed as debris, there is no basis to conclude that it could have caused the stains from bodily fluid found on J.H.'s underwear. Accordingly, as the record support's the PCRA court's determination that Bolin's third ineffectiveness claim lacked arguable merit, we conclude that his third issue merits no relief.

In his fourth issue, Bolin challenges the PCRA court's determination that counsel was not ineffective for failing to object to, or seek to exclude, Commonwealth's Exhibit 6, and the reading of an excerpt therefrom by a nurse at trial. As explained by the PCRA court:

> On April 27, 2021, the Commonwealth filed Commonwealth's omnibus pretrial motion, Commonwealth's notice pursuant to 42 Pa.C.S.A. § 5985.1(b), requesting a tender years hearing. On June 7, 2021, a tender years hearing was held before the [trial] court. Testimony was provided by J.H. As part of J.H.'s testimony, the [trial] court found J.H. to be competent to testify at trial. The Gettysburg Hospital sexual assault forensic examiner's record, dated June 4, 2021, was admitted into

- 25 -

evidence at the tender years hearing. Such report contained a statement J.H. made to . . . Nurse Hannah Kauffman (hereinafter "Nurse Kauffman") and Nurse [Shannon] Small [("Nurse Small")]. On June 11, 2021, the [trial] court granted the Commonwealth's tender years motion and ruled that the following statements are relevant and that the time, content[,] and circumstances of the statement provide sufficient indicia of reliability, and the portion of the statement describing the alleged offenses in this case are admissible at trial: CAC interview of J.H, by Krista Long on June 8, 2020[;] statement made by J.H. to Nurse Kauffman on June 4, 2020[;] and statement made by J.H. to . . . Bunty on June 4, 2020.

PCRA Court Opinion, 1/24/25, at 12.

Commonwealth Exhibit 6 consists of a medical records transmittal which included interview notes prepared by Nurse Kauffman, when J.H. was brought to the hospital Emergency Room. The interview notes included the statements made by J.H. to both Nurse Kauffman and Nurse Small on June 4, 2020. At the time of trial, Nurse Kauffman was working as a traveling nurse in Florida. As such, the Commonwealth called Nurse Small as a trial witness. When asked, Nurse Small could not remember exactly what J.H. had said during the interview, and the trial court permitted her to read an excerpt from the interview notes prepared by Nurse Kauffman:

> [Prosecutor]: Now, did J.[H.] tell you and [Nurse Kauffman] why she was there?
>
> [Nurse Small]: She did.
>
> [Prosecutor]: Okay. And what did she tell you?
>
> [Nurse Small]: That I would have to refer to the chart for exactly because . . . (trails off.)

- 26 -

[Prosecutor]: Now, as you previously described, is the chart documented using, I think your words were parenthesis or quotation marks or—

[Nurse Small]: Yeah, quotation marks it should be.

[Prosecutor]: - for [J.H.'s] direct statement, is that correct?

[Nurse Small]: Yes.

[Prosecutor]: And, so, you're requesting to be able to refer to that in order to accurately restate them?

[Nurse Small]: I'm sorry?

[Prosecutor]: You're asking to be able to refer to the report in order to accurately —

[Nurse Small]: What she said exactly I would have to go through the —

[Prosecutor]: Your Honor, I'm going to ask the witness be permitted to refer to the report.

The Court: Any objection, counsel?

[Trial Counsel]: No. No, Your Honor.

The Court: Thank you. You may refer to the report.

N.T. (Trial), 8/2/21, at 111-12.

Nurse Small was then permitted to read the following limited excerpt from the interview notes contained in Exhibit 6:

[J.H.] states "I was having a hard time sleeping because I was hot, I went downstairs to the living room and dad was there as well. I sat on the couch with him. He thought I was sleeping and he put his fingers inside of my underwear, and a couple minutes later pulled my shorts to the side and stuck his tongue down there." I asked what "down there" means and [J.H.] pointed to her vaginal area. [J.H.] then stated "I continued to act like I was sleeping for a little while, then I got up and went to my room.

- 27 -

My dad did come up and give me a fan, a kiss, and a drink of water."

*Id*. at 114-15; PCRA Exhibit 6.

Generally, an out-of-court statement is inadmissible at trial unless it falls into one of the exceptions to the hearsay rule. ***See Commonwealth v. Charlton***, 902 A.2d 554, 559 (Pa. Super. 2006). "The rationale for the hearsay rule is that hearsay is too untrustworthy to be considered by the trier of fact. Exceptions have been fashioned to accommodate certain classes of hearsay that are substantially more trustworthy than hearsay in general, and thus merit exception to the hearsay rule." *Id*. (citations omitted).

The tender years exception to the rule against hearsay is set forth in 42 Pa.C.S.A. § 5985.1, relating to the admissibility of certain statements by a child sexual abuse victim. In relevant part, section 5985.1 provides that a hearsay statement of a child sexual abuse victim under the age of twelve is admissible provided the evidence is relevant and the time, content and circumstances of the statement provide sufficient indicia of reliability. ***See Commonwealth v. O'Drain***, 829 A.2d 316, 320 (Pa. Super. 2003); ***see also*** 42 Pa.C.S.A. § 5985.1(a). "The tender years exception allows for the admission of a child's out-of-court statement due to the fragile nature of young victims of sexual abuse." ***Commonwealth v. Fink***, 791 A.2d 1235, 1248 (Pa. Super. 2002) (citation omitted).

Bolin argues the admission of J.H.'s statements from the interview notes in Exhibit 6, as read by Nurse Small at trial, violated his constitutional

right to confrontation. The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). In *Crawford*, the United States Supreme Court established a new framework for analyzing claims relative to the confrontation clause of the Sixth Amendment. Prior to *Crawford*, any out-of-court statement could be admitted without offending the confrontation clause so long as the evidence fell within a firmly rooted hearsay exception or contained particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability. *See Charlton*, 902 A.2d at 560. *Crawford* held that out-of-court statements by witnesses that are testimonial are barred under the Sixth Amendment to the United States Constitution unless "the declarant is unavailable, and . . . the defendant has had a prior opportunity to cross-examine," regardless of whether such statements are deemed reliable by the trial court. *Crawford*, 541 U.S. at 59 (citations omitted).

However, this Court has ruled that in the context of a child sexual assault victim, where the record reveals that the victim testified at length regarding the underlying events at both a pretrial competency hearing and the jury trial, and the appellant had more than ample opportunity to confront and cross-examine the victim in each instance, the confrontation clause concerns of *Crawford* are not implicated. *See Charlton*, 902 A.2d at 561.

Bolin argues that trial counsel was ineffective for not objecting to or otherwise seeking to exclude Exhibit 6, and Nurse Small's reading therefrom. Bolin asserts that he did not have the opportunity to cross-examine Nurse Kauffman either outside of trial or at trial because the Commonwealth did not call her as a witness. Bolin maintains that Exhibit 6 was a testimonial document admitted through Nurse Small's in-court testimony. According to Bolin, the primary purpose of Exhibit 6 was to document J.H.'s disclosures to Bunty, CYS, and police, and the evidence gathered to help establish or prove past events potentially relevant to later criminal prosecution. Bolin asserts that, while Exhibit 6 could serve a limited medical purpose, the document contained more information than was necessary for a medical purpose, including insurance information, a reference that J.H. was examined by the Gettysburg Hospital Sexual Assault Forensic Examiners, a notation by Nurse Kauffman that she explained her role as a forensic nurse to J.H., and a reference to Bolin as the assailant, *etc*.

Bolin explains that trial counsel did not object to the admission of Exhibit 6; rather, he merely requested redaction of statements that Bunty made. Bolin maintains that trial counsel lacked any reasonable basis for not objecting to Nurse Small's reading of Nurse Kauffman's report and the subsequent introduction of Exhibit 6 into evidence. Bolin submits that the confrontation clause supersedes hearsay evidentiary rules and entitled him to be able to confront Nurse Kauffman about what she wrote in her report.

Bolin argues that trial counsel's belief that the Commonwealth could introduce Nurse Kauffman's report of J.H.'s statement through Nurse Small as a prior consistent statement was based on an erroneous understanding of the law. Bolin contends that he was prejudiced because he never had had the opportunity to cross-examine Nurse Kauffman about the accuracy of the contents of Exhibit 6.

The PCRA court considered Bolin's fourth issue and determined that it lacked merit. The court reasoned:

> In [his fourth issue, Bolin] argues trial counsel was ineffective for not objecting to, or seeking to exclude admission of trial Exhibit 6, and the reading thereof by . . . Nurse Small . . . for a confrontation clause violation. This claim has no merit and is not supported by the facts presented at trial.
>
> * * * *
>
> [Bolin] argues that the testimony of Nurse Small was a violation of the confrontation clause because Nurse Kauffman was not available for cross-examination. During the forensic exam on June 4, 2020, Nurse Small was supervising Nurse Kauffman and was present for the entire forensic examination. The statement admitted into evidence was the statement J.H. provided to both Nurse Kauffman and Nurse Small during the forensic examination on June 4, 2021. The statement in question was made by J.H. and any confrontation clause issue involves J.H. ***J.H. testified at both the tender years hearing and at trial and was subject to cross-examination concerning statements J.H. made to others about the incident, including Nurse Kauffman and Nurse Small***. Prior to trial the court had correctly ruled that such statement was admissible at trial under the tender year's statute.
>
> * * * *
>
> While Commonwealth Exhibit 6 was admitted into evidence, no other portion of Commonwealth Exhibit 6 was presented to the jury nor did the jury receive any other information contained

- 31 -

within Exhibit 6 other than J.H.'s statement. As such, [Bolin's fourth issue] has no merit. ***There was no confrontational clause violation because the statement was made by J.H., who testified a[t] both the tender years hearing and jury trial and was subject to cross-examination concerning any statements she made, including the statements made to Nurse Kauffman and Nurse Small***. Such statement was admissible under the tender years statute. Trial counsel had a reasonable basis for not objecting to the admission of the statement through Nurse Small. [Bolin] was not prejudiced by trial counsel's act or omission.

PCRA Court Opinion, 1/24/25, at 11-16 (capitalization and emphasis added, unnecessary capitalization omitted).

Based on our review, we conclude that the PCRA court's determination that counsel was not ineffective for failing to object to the admission of Exhibit 6, and the reading thereof by Nurse Small, is supported by the record and free of error. Initially, while Bolin asserts that trial counsel should have objected to the entirety of Exhibit 6, the PCRA court made clear that no other portion of Commonwealth Exhibit 6 was presented to the jury, nor did the jury receive any other information contained within Exhibit 6 other than J.H.'s statement. ***See id***. Thus, Bolin's complaints as to the remaining portions of Exhibit 6 lack arguable merit.

Furthermore, while Bolin claims that his constitution rights were violated because he was unable to confront Nurse Kauffman about the accuracy of her report regarding J.H.'s statements, Nurse Kauffman was not Bolin's accuser. Rather, J.H. was Bolin's accuser. In this regard, as the PCRA court made clear, Bolin was able to confront and cross-examine J.H.

regarding her accusations at both the tender years hearing and jury trial. *See id*. Thus, the confrontation clause concerns of ***Crawford*** were not implicated in this matter. ***See Charlton***, 902 A.2d at 561. Accordingly, as the record support's the PCRA court's determination that Bolin's fourth ineffectiveness claim lacked arguable merit, we conclude that no relief is due.

In his fifth issue, Bolin contends that trial counsel was ineffective for failing to present the character testimony of Bolin's sister, Holly Owens ("Owens"). When a petitioner claims that counsel was ineffective for not offering the testimony of a particular witness, the petitioner must show: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. ***See Commonwealth v. Matias***, 63 A.3d 807, 810-11 (Pa. Super. 2013) (*en banc*).

Further, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Pa.R.E. 404(a)(1). However, in a criminal case, "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." Pa.R.E. 404(a)(2)(A). "When evidence of a person's character or

character trait is admissible, it may be proved by testimony about the person's reputation." Pa.R.E. 405(a).

Importantly, "[t]estimony about the witness's opinion as to the character or character trait of the person is not admissible." Pa.R.E. 405(a). Instead, character evidence is limited to testimony about a witness's general reputation in the community. *See Commonwealth v. Goodmond*, 190 A.3d 1197, 1201 (Pa. Super. 2018). A party seeking to admit character evidence bears the burden of establishing a foundation for that evidence. *Id*. To prove the foundation for reputation evidence, the proponent must establish that the impeaching witness: (1) is a member of the same community of the witness to be impeached; (2) is aware of the general reputation of the person in question for the specific character trait; and (3) knows the person has a reputation for the relevant trait in the community. *See Commonwealth v. Smith*, 567 A.2d 1080 (Pa. Super. 1989); *see also Commonwealth v. Boone*, 354 A.2d 898, 904 (Pa. 1975) (holding that such evidence must be relevant to the time-period surrounding the act in question and must be established by testimony of witnesses as to the *community opinion* of the individual in question).

Pertinently, during the PCRA evidentiary hearing, PCRA counsel engaged in the following examination of Owens:

[PCRA counsel]: Okay. And were you available to testify at [Bolin's] trial?

[Owens]: Yes.

[PCRA counsel]: And would you have been willing to testify?

[Owens]: Yes.

[PCRA counsel]: Okay. Did [trial counsel] ever ask you to testify as a character witness?

[Owens]: No.

[PCRA counsel]: Did he have any discussion with you just in general about maybe testifying?

[Owens]: Yes.

[PCRA counsel]: So, he talked to you about testifying but not specific as to a character witness?

[Owens]: Correct.

[PCRA counsel]: And based on your interaction with [Bolin], what was [his] reputation in the community regarding chasteness with minors?

[Owens]: He had an excellent reputation.

[PCRA counsel]: And had you been called to testify, could you have testified that the allegations against him were out of that character?

[Owens]: Yes.

N.T. (PCRA Hearing), 9/5/24, at 70-71.

The PCRA court then engaged in the following exchange with Owens:

The Court: . . . So, I guess my question is, what is your understanding of the definition of chasteness?

[Owens]: Abstaining from inappropriate touch or sexual conduct with - -

The Court: With minors.

- 35 -

[Owens]: - - with minors or - -

The Court: Let me ask then, that's his reputation in the community?

[Owens]: Yes.

The Court: Yes? And you've heard other people in the community say that? *Have you heard other people in the community tell you* that, that he does not have - - *that he has a reputation for chasteness with minors*?

[Owens]: *I have not heard that directly from the community* - -

The Court: *So you* - -

[Owens]: - - those words.

The Court: - - *haven't heard other people in the community tell you that?*

[Owens]: *No*.

The Court: *So, that's your opinion based on your being around [Bolin]?*

Owens: *Correct*.

*Id*. at 73-74 (emphasis added).

PCRA counsel then further questioned Owens, as follows:

[PCRA counsel]: So, what was [Bolin's] reputation regarding - - in the community regarding chasteness with minors?

[Owens]: *In my opinion, he had an excellent reputation*.

[Prosecutor]: Objection.

The Court: Sustained.

[PCRA counsel]: I'm not asking what your opinion is.

- 36 -

Owens: Okay.

[PCRA counsel]: Okay. I'm asking what was [Bolin's] reputation in the community regarding chasteness with minors?

Owens: He had an excellent reputation.

[PCRA counsel]: Thank you.

The Court: ***And was that based on people in the community telling you that***?

Owens: ***No***.

***Id***. at 78-79 (emphasis added).

Bolin argues that trial counsel knew of Owens' existence, and she was available and willing to testify for Bolin. Bolin claims that, if called to testify, Owens would have testified to Bolin's reputation in the community related to being chaste with children. Bolin points out that Owens testified that she has known her brother for his entire life, and that, because she lived nearby, she would regularly see him and interact with him around children and other persons. Bolin points to Owens' testimony at the PCRA evidentiary hearing that Bolin's reputation in the community regarding chasteness with minors was an excellent reputation. Bolin maintains that, had Owens been called as a witness, she could have testified that the allegations against him were out of that character. Bolin claims that while persons in the community never specifically said the exact words to Owens that he had an excellent reputation for chasteness with minors, "she did have conversations with persons in the community and he did have such a reputation based on those conversations."

Bolin's Brief at 28. Bolin submits that Owens' testimony was entirely consistent with how ordinary lay people speak and interactions that occur after such allegations.

Bolin indicates that trial counsel advised him that, if he presented character witnesses, that it could open the door to introduction of Bolin's prior criminal history. Bolin argues that trial counsel erroneously believed that Bolin's *crimen falsi* convictions would have been admissible to impeach a character witness even if the witness was not testifying concerning a defendant's reputation for truthfulness. Bolin argues that, even if his *crimen falsi* convictions would have been admissible, those convictions would have been irrelevant to the chasteness character trait in question. Thus, Bolin submits that trial counsel's basis for not using character evidence was legally mistaken.

In sum, Bolin claims that he was denied a fair trial due to trial counsel's decision not to present Owens' character evidence on his chasteness with minors. Bolin submits that trial counsel could not have an objective reasonable basis for not calling Owens to testify where counsel was unaware of the legal grounds to present such testimony and erroneously believed that Bolin's criminal history would be admissible.

The trial court considered Bolin's fifth issue and determined that it lacked merit. The court reasoned:

> . . . Owens['] testimony was not based on reputation evidence to prove [Bolin's] character for chasteness in the

community but was based on ***her individual opinion*** of [his] character for chasteness. Therefore, [Bolin] failed to establish that the testimony of . . . Owens would have been admissible under Pa.R.E. 404(a) and 405(a) at trial and the court cannot find trial counsel ineffective for failing to call . . . Owens at trial. This claim has no merit.

PCRA Court Opinion, 1/24/25, at 25 (emphasis added, unnecessary capitalization omitted).

Based on our review, we conclude that the PCRA court's ruling is supported by evidence of record and is free of legal error. As explained above, testimony about the witness's ***opinion*** as to the character or character trait of the defendant is not admissible. ***See*** Pa.R.E. 405(a). Rather, the witness must be able to present testimony "as to the ***community*** opinion of the individual in question." ***Boone***, 354 A.2d at 904.

Here, Owens' responses to questioning at the PCRA evidentiary hearing were insufficient to establish that she was aware of, or could testify to, Bolin's reputation for chasteness with minors in the community. In this regard, Owens' testimony made clear that no one had ever told her that Bolin had a reputation for being chaste with minors. ***See*** N.T. (PCRA Hearing), 9/5/24, at 73-74, 78-79. Instead, her purported character testimony was based entirely on her own ***personal opinion***. ***See id***. at 73-74. As explained above, testimony regarding the witness's ***opinion*** as to the character or character trait of the person is not admissible. ***See*** Pa.R.E. 405(a). Thus, Owens' personal opinion regarding Bolin's character for being chaste among minors was irrelevant and would not have been admissible at trial. ***See***

*Commonwealth v. Alceus*, 315 A.3d 853, 867 (Pa. Super. 2024) (noting that the witness' personal opinion about the appellant's reputation for peacefulness in the community was irrelevant and inadmissible). Accordingly, as the record supports the PCRA court's determination that Bolin's claim that trial counsel was ineffective for failing to call Owens as a character witness lacked arguable merit, Bolin's fifth issue warrants no relief.

In his final issue, Bolin claims that trial counsel's cumulative errors were so significant that they deprived Bolin of a fair trial. It is well-settled that where multiple ineffectiveness claims are rejected for lack of arguable merit, there is no basis for an accumulation claim. *See Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009) (observing that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually). Thus, to the extent that infectiveness claims are rejected for lack of arguable merit, there is no basis for an accumulation claim. *See id*. However, when the failure of individual ineffectiveness claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed. *See id*.

Here, we concluded that each of Bolin's ineffectiveness claims failed because either the underlying claim had no arguable merit or that a reasonable basis existed for trial counsel's actions or failure to act. *See Johnson*, 139 A.3d at 1272. We did not conclude that any of Bolin's ineffectiveness claims failed solely for lack of prejudice. Accordingly, in the

instant matter, there is no basis for an accumulation claim. ***See Johnson***, 966 A.2d at 532. Thus, Bolin's final issue merits no relief.

As Bolin is not entitled to relief on any of his issues, we affirm the PCRA court's order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/18/2026